NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

22-P-295                                      Appeals Court

COMMONWEALTH  vs.  EVANS STROMAN.

No. 22-P-295.

Bristol.     April 10, 2023. – August 17, 2023.

Present:  Milkey, Massing, & Henry, JJ.


Firearms.  Search and Seizure, Motor vehicle.  Constitutional Law, Search and seizure, Investigatory stop, Equal protection of laws.  Practice, Criminal, Motion to suppress, Interlocutory appeal.  Evidence, Statistics, Pattern of conduct.


Indictment found and returned in the Superior Court Department on December 19, 2019.

A pretrial motion to suppress evidence was heard by Thomas J. Perrino, J.

An application for leave to prosecute an interlocutory appeal was allowed by David A. Lowy, J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by him to the Appeals Court.


Mark Booker for the defendant.
Julianne Campbell, Assistant District Attorney, for the Commonwealth.

MASSING, J.  A defendant who files a motion to suppress alleging a race-based traffic stop and supports the motion with materials that create a reasonable inference of discrimination is entitled to an evidentiary hearing.  At that hearing, the Commonwealth bears the burden of proving that the stop was not racially motivated.  See Commonwealth v. Long, 485 Mass. 711, 724 (2020).  In this interlocutory appeal,[1] we consider whether the Commonwealth successfully rebutted the inference of discrimination with testimony of the officer who made the traffic stop, which the judge credited, that he was unaware that the driver was Black until after he made the stop.  Confident that the judge properly considered relevant factors in finding that the officer did not exercise his law enforcement powers in a discriminatory manner, we affirm.

Background.  The defendant, Evans Stroman, was arrested as the result of a traffic stop that occurred in New Bedford around 2 A.M.  After stopping the defendant's car because its rear license plate was not illuminated, but before approaching the driver, New Bedford Patrolman Adam Amaro learned that the owner of the car had an outstanding arrest warrant and that he was Black.  After confirming that the defendant was the driver and

---

[1] A single justice of the Supreme Judicial Court allowed the defendant's petition for leave to file an interlocutory appeal.

the owner, in the course of arresting the defendant on the warrant, Amaro discovered a handgun on the defendant's person. The defendant was subsequently indicted for unlawfully carrying a firearm without a license, in violation of G. L. c. 269, § 10 (a), as an armed career criminal, see G. L. c. 269, § 10G.[2]

Alleging that the traffic stop was racially motivated, the defendant filed a motion to suppress the evidence and statements obtained from the stop. His motion was accompanied by several exhibits, including all citations that Amaro had issued from November 2018, around the time that he joined the police force, through November 2020.[3] During that two-year period, Amaro issued sixty-six citations and, of those, twenty-six percent were issued to Black motorists. According to 2019 U.S. Census

---

[2] The indictment alleged three prior convictions for violent crimes, which would qualify the defendant as an "armed career criminal" under G. L. c. 269, § 10G (c), see Commonwealth v. Johnson, 102 Mass. App. Ct. 195, 206 n.9 (2023), as well as two adjudications of delinquency for serious drug offenses.

[3] The defendant amassed much of the evidence to support his motion through pretrial discovery under the guidelines set forth in Long, 485 Mass. at 725. We are somewhat hampered in our review because neither party saw fit to include either the motion or the exhibits in the record appendix. It was the defendant's duty, as the appellant, to prepare an appendix including all record materials necessary for our review of his appeal. See Mass. R. A. P. 18 (a), as appearing in 481 Mass. 1637 (2019). In criminal cases, the Commonwealth also has the duty to submit an appendix with any part of the record on which it relies that was not included in the defendant's appendix. See Mass. R. A. P. 18 (a) (2) (A), as appearing in 481 Mass. 1637 (2019).

Bureau data, also supplied with the motion, seven percent of the population of New Bedford is Black or African-American. Four of the ten citations that Amaro issued for license plate light violations, including the one issued to the defendant, were issued to Black drivers.

In addition, the defendant offered a New Bedford Police Department directive from 2006, implementing what the judge described as a "zero-tolerance strategy" for addressing gun violence. The directive encouraged rigorous use of tactics such as "threshold inquiries, field interviews, motor vehicle stops, warrant checks, and street encounters," particularly between the hours of 10 P.M. and 5 A.M. The directive cautioned that "no stop, search or seizure should be conducted without the appropriate level of legal justification," and that such patrol activities were not intended to violate any individual's civil or constitutional rights. The directive explicitly recognized that such tactics might be perceived as discriminatory.

At the hearing on the motion to suppress, the judge determined that the defendant had made a threshold showing of discriminatory enforcement sufficient to warrant an evidentiary hearing. The judge admitted in evidence the exhibits attached to the defendant's motion. The Commonwealth then called Amaro, the only witness to testify at the hearing.

Amaro testified that he was working the midnight to 8 A.M. shift on November 25, 2019, wearing a uniform and driving a marked cruiser. At about 2 A.M., he was patrolling Rivet Street as the bars in the area were closing. He encountered a blue Audi A6 four-door sedan traveling on Rivet Street and noticed that the car's rear license plate was not illuminated, in violation of the motor vehicle laws. Amaro followed the Audi for a few seconds as the car turned onto County Street, whereupon he activated his blue and white overhead lights and stopped the vehicle. Amaro's headlights allowed him to read the Audi's rear license plate; he entered the registration in his cruiser's mobile data terminal and called the dispatcher to report the stop and his location. The data terminal showed that the vehicle was registered to the defendant, who had an outstanding warrant. It also displayed a photograph, from which Amaro learned that the registered owner was Black.

Amaro approached the driver's side of the car and saw that it had two occupants, the driver and a front seat passenger, both Black men. Amaro asked the driver for his license and registration, which confirmed that the driver and the registered owner were one and the same. Amaro returned to his cruiser and called the dispatcher to check the status of the defendant's warrant; he was told that it was active and involved a carjacking charge. The judge found that "[b]y this time or

earlier, several backup officers had arrived on scene and they too approached the car." Amaro asked the defendant to get out of the car to arrest him on the warrant. Assisted by another officer, Amaro pat frisked the defendant and found a handgun tucked into the waistband of his pants.

The judge found Amaro's testimony "credible in all respects." The judge recognized that Amaro "certainly had an interest in defending his conduct and the reason for initiating the stop," but that "he was candid where candor was called for." The judge made findings regarding Amaro's awareness of the defendant's race. "While Amaro was behind the Audi he was not able to see the race, gender, or any characteristics of any occupant, but he was able to determine that two people were in the car." After Amaro stopped the defendant's vehicle and looked up its license plate, "[a] photograph associated with an Evans Stroman depicted that individual as African[-]American. That photograph was the first indication Amaro had regarding the racial make-up of a potential occupant." The judge found, "When questioned about his motives for initiating the stop, Amaro credibly denied that the occupants' race was a factor in any way. He testified he had no idea of the race, gender or ethnic background of the driver or occupant when he decided to initiate the stop."

Near the beginning of Amaro's testimony, the prosecutor asked Amaro to describe his "nationality." Over the defendant's objection, Amaro responded, "I'm Hispanic." At the end of Amaro's direct testimony, the prosecutor asked how he felt about the accusation that some of his traffic citations were motivated by race. Again over the defendant's objection, Amaro testified that it was "kind of offensive" because "that's not the police officer I am. That's not the way I was raised. So, I definitely take offense to it." The judge found, "As a person of Hispanic ethnicity, born and raised in New Bedford," Amaro found the suggestion that race was a factor in the stop "offensive and contrary to [his] upbringing and training."

The judge found that the Commonwealth had successfully "grappled" with and rebutted the defendant's evidence of discrimination "and showed that . . . Amaro's stop of the vehicle was not motivated, even in part, by racial bias." The judge further found that "Amaro credibly testified as to why he initiated the stop, the sequence of events and the way the stop was conducted and progressed. Implicit bias may result in race-based traffic stops without . . . conscious awareness, however, such was not indicated by the testimony and circumstances of this stop." The judge denied the motion to suppress, stating, "Based on the totality of the circumstances, the evidence

presented by the Commonwealth sufficiently demonstrates the stop was not motivated by racial bias."

Discussion. "Equal protection jurisprudence encompasses two broad categories of rights, which protect people against selective prosecution and selective enforcement." Commonwealth v. Robinson-Van Rader, 492 Mass. 1, 16 (2023). In this case we are concerned with selective enforcement, which "refers to law enforcement practices that unjustifiably target an individual for investigation based on the individual's race or other protected class." Id. Selective enforcement claims "are notoriously hard to prove." Note, Criminal Law -- Discriminatory Enforcement -- Racial Profiling -- Statutory Rape, 93 Mass. L. Rev. 342, 342 (2011).

To make it easier for defendants to advance such claims in the context of traffic stops, in Long, 485 Mass. at 721-726, the Supreme Judicial Court "revised the standard by which a defendant can establish a claim of selective enforcement, in the context of the traffic laws." Robinson-Van Rader, 492 Mass. at 17.[4] See Long, supra at 723 (noting that prior decisions "set a nearly impossible bar for victims of discriminatory traffic

---

[4] The revised standard from Long, which was developed to address claims of racial profiling in traffic stops, now applies to claims of selective enforcement in "pedestrian stops and threshold inquiries, as well as other selective enforcement claims challenging police investigatory practices." Robinson-Van Rader, 492 Mass. at 18.

stops to clear in order to establish their claims"). Under the revised framework, the defendant has the burden of production on a motion to suppress to establish a reasonable inference that a traffic stop was motivated by racial bias. See Robinson-Van Rader, supra; Long, supra at 724. To establish a reasonable inference, the defendant "must produce evidence upon which a reasonable person could rely to infer that the officer discriminated on the basis of the defendant's race or membership in another protected class. Conclusive evidence is not needed." Long, supra at 723-724.

"If the defendant's motion establishes such an inference, the defendant is entitled to a hearing, at which the Commonwealth would bear the burden of rebutting the inference." Long, 485 Mass. at 724. See Robinson-Van Rader, 492 Mass. at 17 ("If the defendant does raise an inference of discrimination, the burden shifts to the Commonwealth to rebut the inference by establishing a race-neutral reason for the stop"). The Commonwealth must "do more than merely point to the validity of the traffic violation that was the asserted reason for the stop. Rather, it would have to grapple with all of the reasonable inferences and all of the evidence that a defendant presented, and would have to prove that the stop was not racially motivated." Long, supra at 726.

"In examining a claim of selective enforcement, a reviewing judge must consider the totality of the circumstances surrounding the claim."  Robinson-Van Rader, 492 Mass. at 20. The judge should consider the following nonexclusive factors, along with any other relevant evidence:

> "(1) patterns in enforcement actions by the particular police officer; (2) the regular duties of the officer involved in the stop; (3) the sequence of events prior to the stop; (4) the manner of the stop; (5) the safety interests in enforcing the motor vehicle violation; and (6) the specific police department's policies and procedures regarding traffic stops" (footnotes omitted).

Long, 485 Mass. at 724-725.

Here, concluding that the defendant had raised a reasonable inference of discrimination in his motion to suppress, the judge properly convened an evidentiary hearing and required the Commonwealth to establish that the traffic stop was not motivated by race.[5]  The judge conscientiously addressed the applicable factors set forth in Long and reached the conclusion that the Commonwealth had carried its burden.

The defendant takes issue with several aspects of the judge's determination.

1.  Statistical evidence of enforcement patterns. Regarding Amaro's traffic citations, the judge found, "While the

---

[5] The Commonwealth does not contest the judge's determination that the defendant's motion was sufficient to shift the burden.

statistics of Amaro's stop[s] raised a reasonable inference [of discrimination], the data is not conclusive." Specifically, the judge noted that "[t]he statistics provide a small sample size in that they do not include any other encounters which Amaro may have had with people while on patrol." He also commented that comparison "to the census population for the city of New Bedford" was "unreliable," as it did not necessarily reflect the demographics "of drivers on the road on which the defendant was stopped."

As to the sample size, the defendant correctly points out that if Amaro's citations were "racially skewed," it is a reasonable inference that all of his traffic stops would be similarly disproportionate. See Long, 485 Mass. at 733. The defendant is also correct that census data is considered more reliable "where the relevant roadways are urban residential roads, as opposed to an interstate highway." Id. However, the error in Long was that the judge rejected the defendant's data as insufficient to create a reasonable inference of discrimination. Id. at 732-733. Here, by contrast, the judge found that the data did create a reasonable inference and required the Commonwealth to rebut the inference at an evidentiary hearing. The defendant is, in effect, asserting that because his statistical showing was unrebutted, the judge was required to find that the Commonwealth failed to carry its

burden.  We do not read Long as requiring the Commonwealth to rebut each facet of the defendant's showing.  Rather, the totality of the circumstances, to which we now turn, is dispositive.

2.  Other Long factors.  In addition to the patterns of Amaro's enforcement activity, the defendant stresses the New Bedford Police Department's zero-tolerance directive, the relatively minor public safety implications of license plate light violations, and the number of officers who arrived on the scene as evidence that he was stopped because of his race.

As to the directive, which was issued twelve years before Amaro joined the force, the judge credited Amaro's testimony that although he was "generally aware" of the directive, "it played no role in the stop of Stroman or his reason for initiating the stop."  Even if the directive did play a role in Amaro's decision-making, however, it would be for the judge to decide whether, and to what extent, the directive was probative of discriminatory intent.  The directive on its face encouraged officers to stop any driver for any infraction, regardless of the driver's race.  On the other hand, to the extent Amaro "targeted intensive traffic enforcement efforts only at neighborhoods where most residents are people of color," Long, 485 Mass. at 730, a discriminatory intent might be inferred.  Here, however, there was no evidence that the area Amaro was

patrolling had a concentration of Black motorists.[6]  If the census data provided an accurate estimate of the race of drivers on New Bedford's urban residential roads, as discussed supra, and only seven percent of drivers are Black, then the inference that the directive was applied in a discriminatory manner is weaker.

With respect to the relatively minor nature of the offense for which the defendant was stopped, the question before us is not whether a reasonable officer would have made a traffic stop for a license plate light violation in this location at 2 A.M. in late November if race was not a factor, but rather, whether Amaro actually chose to stop the defendant's car because of the defendant's race.[7]  The Long test looks to the "true" or "subjective" motivations of the officer at the time of the stop. Long, 485 Mass. at 726-727.  Here, giving foremost consideration to "the sequence of events prior to the stop," id. at 724, the judge found that Amaro's true motivation for the stop was the

_____

[6] Amaro testified that one end of Rivet Street has some public housing and that the area where he stopped the defendant, near County Street, was "more lively," with "a couple [of] bars," a bank, a church, and a convenience store.  There was no testimony about the distance from the public housing to County Street, or the demographics of the housing development.  Amaro testified that he grew up near a housing project, but he did not give its location in relation to Rivet Street.

[7] Chief Justice Budd has suggested using such a "would have" test instead of requiring the judge to determine "the officer's true motive."  Long, 485 Mass. at 745 (Budd, C.J., concurring).

traffic infraction and not the race of the driver, because Amaro did not know the driver's race at the time of the stop.

The defendant's argument that the manner of the stop, where several officers appeared in response to a civil motor vehicle infraction, was indicative of racial discrimination is unpersuasive. The interaction went beyond a routine traffic stop as soon as Amaro discovered that the defendant had an outstanding warrant. Although the record is unclear as to exactly when the backup officers arrived, based on the materials available to us,[8] the police response was proportional to the situation as it unfolded. See Commonwealth v. Sinforoso, 434 Mass. 320, 323 (2001).

"Racial profiling 'is generally understood to mean the improper use of race as a basis for taking law enforcement action.'" Commonwealth v. Lora, 451 Mass. 425, 426 n.1 (2008), quoting Chavez v. Illinois State Police, 251 F.3d 612, 620 (7th Cir. 2001). The judge in effect found that because Amaro did not know the defendant's race before initiating the stop, as a matter of fact he was not engaging in racial profiling when he made the stop. We discern no clear error or abuse of discretion in the judge's reasoning or conclusion.

---

[8] See note 3, supra.

3.  Officer's personal attributes.  The defendant argues that it was error to permit Amaro to testify that he was Hispanic and that he was offended by being accused of racial profiling.  The defendant posits that this testimony had no relevance on the question whether his stop of the defendant was motivated by race.  See Mass. G. Evid. § 401 (2023) ("Evidence is relevant if [a] it has any tendency to make a fact more or less probable than it would be without the evidence and [b] the fact is of consequence in determining the action").

We agree that Amaro's offense at being accused of discrimination has little, if any, relevance.  Most, if not all, police officers accused of bigotry or racism would deny such accusations.  In determining Amaro's true motivation, however, his testimony that he was "offended" by the suggestion that he stopped the defendant because the defendant was Black is not appreciably different from denying that raced played any role in his decision to stop the defendant.  "Because implicit bias may lead an officer to make race-based traffic stops without conscious awareness of having done so, . . . a simple denial is insufficient to rebut the reasonable inference [of impermissible discrimination]."  Long, 485 Mass. at 734.[9]

---

[9] Similarly, an attorney's denial of discriminatory animus in exercising a peremptory challenge does not rebut a claim that the strike was discriminatorily motivated.  See Batson v. Kentucky, 476 U.S. 79, 98 (1986), quoting Alexander v.

The relevance of Amaro's testimony that he is Hispanic is a more complicated question. The evidence of his background, per se, clearly had no bearing on his credibility. "Evidence of nationality, race, or color cannot be introduced to affect the credibility of individual witnesses." Commonwealth v. Kazules, 246 Mass. 564, 566 (1923). To the extent the Commonwealth offered evidence of Amaro's Hispanic origin to suggest that he was less likely to discriminate against Black drivers, such a suggestion, without more, is merely speculative. As an initial matter, the term "Hispanic" is a broad term that may refer to a variety of cultures and origins.[10] Moreover, it would be improper to infer that simply because Amaro is Hispanic, he would be incapable of discriminating against others of Hispanic origin, let alone against members of other groups. See Oncale

---

Louisiana, 405 U.S. 625, 632 (1972) ("Nor may the prosecutor rebut the defendant's case merely by denying that he had a discriminatory motive or 'affirm[ing] [his] good faith in making individual selections'"). See also Commonwealth v. Maldonado, 439 Mass. 460, 465 (2003) ("The mere denial of an improper motive is inadequate to establish the genuineness of the explanation").

[10] For example, the 2010 Census defined "Hispanic or Latino" to refer to "a person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin regardless of race." Overview of Race and Hispanic Origin: 2010, U.S. Department of Commerce, Economics and Statistics Administration, U.S. Census Bureau 2 (March 2011), https://www.census.gov/content/dam/Census/library/publications/2011/dec/c2010br-02.pdf [https://perma.cc/6QQH-Z227].

v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78 (1998),
quoting Castaneda v. Partida, 430 U.S. 482, 499 (1977) ("Because
of the many facets of human motivation, it would be unwise to
presume as a matter of law that human beings of one definable
group will not discriminate against members of their group").[11]

This is not to say that race and ethnicity are irrelevant
in interactions between police officers and the public.  See,
e.g., Commonwealth v. Warren, 475 Mass. 530, 539-540 (2016)
(race relevant in determining significance of suspect's flight
from police officers).  But in asserting and assessing evidence
that a person acted a particular way because of personal
characteristics, litigants and judges must take great care to
ensure they are acting on competent evidence rather than
stereotypes.[12]

---

[11] We recognize that distinctions between race and ethnicity
are malleable and difficult to make, and that a person of
Hispanic origin may also identify as Black or white.  See
Commonwealth v. Colon, 482 Mass. 162, 177 n.12 (2019); Village
of Freeport v. Barrella, 814 F.3d 594, 602-603 & nn.13 & 14 (2d
Cir. 2016).

[12] In the context of peremptory challenges, Justice O'Connor
commented that there may be a grain of truth in some assumptions
based on personal characteristics.  See J.E.B. v. Alabama ex
rel. T.B., 511 U.S. 127, 148-149 (1994) (O'Connor, J.,
concurring) ("A plethora of studies make clear that in rape
cases, for example, female jurors are somewhat more likely to
vote to convict than male jurors").  Nonetheless, those
assumptions are "irrelevant as a matter of . . . law" in
considering an attorney's motives for striking jurors.  Id. at
149.  "That the Court will not tolerate prosecutors' racially
discriminatory use of the peremptory challenge, in effect, is a

Even if Amaro's testimony about his origin and umbrage had little relevance, the judge did not err in admitting it at the evidentiary hearing on the defendant's motion to suppress. "The law of evidence does not apply with full force at motion to suppress hearings." Mass. G. Evid. § 1101(d) (2023). "At a hearing on a motion to suppress, judges should 'err on the side of considering more, not less, information' and then determine the credibility, reliability, and weight to be applied to that evidence." Commonwealth v. Evelyn, 485 Mass. 691, 706 (2020), quoting United States v. Stepp, 680 F.3d 651, 669 (6th Cir. 2012). Discussing Amaro's testimony in his findings, the judge cited and paraphrased Long, 485 Mass. at 734, stating that "a simple denial by the officer that the stop was race based is insufficient to rebut a reasonable inference." He further found, "The evidence here presented more than a simple denial. Amaro did not know the racial make-up of the occupants until he approached the vehicle." We are confident that the judge gave the challenged testimony appropriate consideration in determining the state of Amaro's actual knowledge and motivation at the time he stopped the defendant's car.

_____

special rule of relevance, a statement about what this Nation stands for, rather than a statement of fact." Id., quoting Brown v. North Carolina, 479 U.S. 940, 941-942 (1986) (O'Connor, J., concurring in denial of certiorari).

Conclusion.  "We conclude that the evidence supported the judge's determination that police stopped the defendant" for the motor vehicle violation, "and not because of his race." Robinson-Van Rader, 492 Mass. at 24.  Nonetheless, a word of caution is in order.  Nothing in this opinion should be taken to suggest that police officers can defeat claims of selective prosecution in traffic stops simply by testifying that they did not know the race of the driver before they made the stop. Ultimately, the judge holding the evidentiary hearing must, as the judge did here, carefully assess the officer or officers' credibility and determine -- under the totality of the circumstances, and in light of the factors that created the reasonable inference of discrimination requiring an evidentiary hearing in the first place, see id. at 20; Long, 485 Mass. at 724-725 -- whether the stop was truly made without knowledge or consideration of race.  "America's trial judges operate at the front lines of American justice."  Flowers v. Mississippi, 139 S. Ct. 2228, 2243 (2019).  Just as "trial judges possess the primary responsibility to . . . prevent racial discrimination from seeping into the jury selection process," id., they also bear the responsibility for ensuring that claims of selective enforcement are fairly adjudicated.

Order denying motion to
suppress affirmed.